**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Lucas K. Johnson, on behalf of himself and the Class he seeks to represent,

    Plaintiff,

    vs.

United States Department of Transportation; Elaine L. Chao, Secretary of the U.S. Department of Transportation;

    Defendants.

Case No 1:19-cv-1916 (RDM)

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

(Assigned to the Honorable Randolph D. Moss)

Plaintiff, Lucas K. Johnson, through undersigned attorneys, hereby files this Second Amended Class Action Complaint for Declaratory and Injunctive Relief and Damages against the above-named Defendants.

## PARTIES

1.    Plaintiff Lucas K. Johnson is a resident of and is domiciled in Dallas, Texas. He brings this action on behalf of himself individually and on behalf of a class of persons similarly situated as described further below.

2.    Defendant United States Department of Transportation ("DOT") is a cabinet-level department within the Executive Branch of the federal government. Through its various agencies, including the Federal Aviation Administration ("FAA"), the DOT promulgates regulations and policies governing transportation within the United States, including aviation matters.

3.    Defendant Elaine L. Chao is the Secretary of the DOT. In that capacity, Secretary Chao is responsible for overseeing the actions of all the employees and officers within the DOT agencies, including the Federal Aviation Administration.

## JURISDICTION, VENUE, & EXHAUSTION OF ADMINISTRATIVE RIGHTS

4.    This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, as the matter in controversy arises under the laws of the United States, including but not limited to, Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

5.      Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e).

6.      Plaintiff has exhausted his administrative remedies and complied with all statutory and administrative prerequisites to his Title VII claims. Plaintiff filed a charge of discrimination individually and on behalf of all similarly situated individuals with the United States Department of Transportation Office of Civil Rights on August 15, 2015. On July 6, 2016, the U.S. Equal Employment Opportunity Commission ("EEOC") issued an order of dismissal. Plaintiff timely appealed the Order of Dismissal to the EEOC on July 26, 2016. By notice dated June 15, 2018, the EEOC issued a Notice of Right to Sue. The original Complaint was made within ninety days of the Notice of Right to Sue.

## SUMMARY OF THE CLAIMS

7.      This case involves the decision by Federal Aviation Administration ("FAA") policymakers to engage in racial balancing by screening and eliminating qualified applicants for air traffic control positions based upon their race.

8.      Prior to December 31, 2013, ATC Applicants who meet general qualification requirements regarding work or college experience were required to pass a validated air traffic aptitude test, the Air Traffic Selection and Training Examination ("AT-SAT"), in order to be eligible for employment as a trainee controller. The AT-SAT was developed, validated, and periodically reviewed by the FAA's Civil Aeronautical Medical Institute ("CAMI"). Since the FAA first instituted the AT-SAT, it has been validated multiple times to ensure it was in accord with law and professional guidelines. The AT-SAT was most recently validated in March of 2013.

9.      During the approximate time period of 2010 through 2014, select FAA employees and members of an FAA employee special interest group, the National Black Coalition of Federal Aviation Employees ("NBCFAE"), were collectively and actively working to change the air traffic control hiring process to a system more favorable to African-

Curry, Pearson & Wooten, PLC

814 W. Roosevelt Street
Phoenix, Arizona 85007

2

American applicants because they felt that the candidate pool and air traffic workplace was composed of too few African-American applicants and that the hiring practices and policies, in place since the mid-1990s, unfairly benefited non-African-American applicant groups.

10. This lawsuit is based on the implementation of a new and discriminatory test – the Biographical Assessment/Biographical Questionnaire ("BA") that was put into place by the FAA in order to engage in racial balancing. The BA, which was an unverified and unvalidated examination that produced results with no correlation to the performance abilities needed for the air traffic control specialist position, forbade capable and qualified applicants from moving forward in the hiring process based on pointed, racially biased, and meaningless questions into the applicants' personal background. This resulted in thousands of applicants being barred from moving forward in the hiring process even if they possessed military flight experience, college degrees specific to the job, and/or other advanced aviation experience. The FAA used the BA to discriminate against non-African American and mixed race applicants.

11. Plaintiff brings this action alleging violations of Title VII of the Civil Rights Act of 1964, 72 U.S.C. § 2000e et. seq. ("Title VII") to challenge Defendant Federal Aviation Administration's ("FAA") implementation and use of the BA/BQ as enumerated further herein.

12. It is a violation of Title VII to make hiring decisions based upon race unless a bona fide occupational qualification ("BFOQ") exists.

13. A BFOQ is a quality or an attribute that employers are allowed to consider when making decisions on the hiring and retention of employees.

14. A general desire for racial diversity in the workplace does not constitute a BFOQ.

15. No BFOQ exists as a defense to Defendants' actions as enumerated further herein.

16. The FAA's implementation and use of the BA, starting in February of 2014,

had a disparate impact on Title VII protected groups, including Caucasian, Hispanic, Asian, and mixed-race applicants ("Applicant Groups"). Furthermore, the FAA has engaged in intentional disparate treatment of the same Applicant Groups to unlawfully advantage African-American ATC applicants.

17.    As a result of the FAA's implementation of the BA, the Applicant Groups did not have a fair and equal opportunity to be considered for employment as air traffic control specialists ("ATCS"). The FAA engaged in racial-balancing without just cause. The FAA's hiring policies and practices, announced in 2013 and implemented in 2014, systematically violated the Applicant Groups' rights and resulted in the unchecked racial bias that improperly favored African-American applicants and infected the hiring process.

18.    The disadvantage to the Applicant Groups' employment opportunities is not isolated or exceptional, but rather the regular and predictable result of the FAA's Human Resources and Civil Rights policies and practices as well as the lack of proper accountability measures to ensure fairness.

19.    As elaborated further *infra*, the NBCFAE and certain FAA employees persuaded the FAA to implement the non-validated BA, eliminate personal interviews, and develop policies and procedures where all ATC Applicants were treated as general public hires regardless of aviation or air traffic control experience or background. When these changes were implemented, the FAA initially stated that the changes were made to "add diversity to the workforce."

20.    The FAA's new hiring policy, implemented in January of 2014, first required all ATC Applicants to use the USAJOBS.gov website to complete an electronic application and answer general questions, including questions about race, gender, and experience. ATC Applicants were required to submit a resume along with other relevant data. After completing the electronic application, ATC Applicants next had to pass a biodata questionnaire, the aforementioned BA, to be further considered for employment.

21.    On information and belief, The FAA hired a contractor named Applied

4

Psychological Techniques, Inc. ("APT" or "APTMetrics") to develop and present recommendations regarding revisions to the hiring process and to develop and implement the BA.

22.    The BA was never properly validated according to industry standards or regulatory requirements prior to its implementation.

23.    On February 10, 2014, the FAA opened vacancy announcement FAA-AMC-14-ALLSRCE-33537 ("33537") to solicit ATC Applicants. In accord with the new ATC Applicant hiring policy, implemented in January of 2014, all ATC Applicants were now required to take the computerized, non-proctored BA.

24.    At the time the BA was taken, ATC Applicants were not given a numerical grade or any indication of whether they passed or failed. Approximately one month after taking the BA, ATC Applicants received electronic notice as to if they passed or failed.

25.    According to the FAA, 28,511 ATC Applicants, seeking a fair and equal opportunity chance to become an air traffic controller, took the February 2014 BA.

26.    Out of the 28,511 applications that took the BA, only 2,407 applicants "passed" the BA and were therefore allowed to take the AT-SAT. No numerical grade was given to the ATC Applicants who took the BA, just a red "!" for failure or a green "checkmark" indicating a passing grade.

27.    A very large number of ATC Applicants who failed the 2014 BA possessed extensive professional and academic aviation experience including air traffic education, flight training, and advanced FAA certifications in a variety of aviation fields.

28.    Many ATC Applicants who failed the BA were prior military air traffic controllers, graduates of college management, flight, and air traffic control programs, private and commercial pilots, military pilots, and others with extensive aviation experience. Despite the extensive experience and qualifications, these individuals were institutionally barred from the job because of their failure to "pass" the BA.

29.    The FAA repeatedly stated to ATC Applicants, the American public, Congress,

**Curry, Pearson & Wooten, PLC**
814 W. Roosevelt Street
Phoenix, Arizona 85007

Courts[1], and the media that the February 2014 BA was professionally validated. These collective statements were manifestly untrue and the FAA knew that the BA was not properly validated.

30.     The FAA's pattern and practice for over four decades was to publish validation studies on all examinations regarding the selection of air traffic controller candidates. These studies were undertaken by the FAA's Civil Aeronautical Medical Institute ("CAMI") and made publically available by the FAA. Despite numerous requests, the FAA refused, and continues to refuse, to provide validation studies for the BA.

31.     The non-validated 2014 BA was intentionally misused by the FAA as a minimum qualification screening tool despite affirmative knowledge that such use was improper.

32.     Furthermore, select FAA personnel, and on information and belief their contractors, used the BA to illegally identify, target, and eliminate ATC Applicants from employment consideration based on the applicant's race by identifying responses to various questions on the BA.

33.     Lastly, when a national television network identified cheating meant to benefit one race and disadvantage others, the FAA took affirmative steps to cover-up the illegal activity.

34.     The FAA's intentional misuse of the BA as a screening tool infected the hiring process with racial bias resulting in disparate treatment and impact as further enumerated herein.

## **LEGAL ANALYSIS**
## **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

35.     The purpose of Title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color. *Ricci v. DeStefano*, 557 U.S. 557 (2009).

---

[1] While challenges to the withholding of information regarding the BA have been filed, Plaintiff avers that the *use of* the BA has not been challenged in Court thus far.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

36. Title VII prohibits employment discrimination or disparate treatment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e.

37. Title VII claimants need only demonstrate lack of objective criteria and disparity in hiring or promotions; they need not prove that they would have been most qualified for the job. *Wang v. Hoffman*, 694 F.2d 1146, 1148 (9th Cir. 1982) (citing *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 240-43 (5th Cir.1974), *cert. denied*, 439 U.S. 1115 (1979)).

38. Title VII prohibits discrimination against employees of the federal government and prospective applicants for employment within the federal government. 42 U.S.C. § 2000e-16.

39. Title VII provides that "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" is unlawful employment discrimination. 42 U.S.C. § 2000e(a)(1).

40. Title VII provides that for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin" is an unlawful employment practice. 42 U.S.C. § 2000e(a)(2).

41. Title VII provides that for an employer to give and to act upon the results of any professionally developed ability test designed, intended or used to discriminate because of race, color, religion, sex, or national origin is an unlawful employment practice. 42 U.S.C. § 2000e-2(h).

42. Title VII provides that for an employer, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of employment related tests on the basis of race, color, sex, or national origin is an unlawful employment practice. 42 U.S.C. § 2000e-2(l).

7

Curry, Pearson & Wooten, PLC

814 W. Roosevelt Street

Phoenix, Arizona 85007

43. Title VII prohibits employers from using facially neutral tests or selection procedures that have the effect of disproportionately excluding persons, or regarding in disparate treatment, based on race, color, or national origin. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 988 (1988).

44. Title VII does not require employers to engage in racial balancing by granting preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area. 42 U.S.C. § 2000e-2(j).

45. Absent a valid defense, Title VII prevents a government agency from refusing to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants. *See Ricci*, 557 U.S. at 579.

46. Specifically, a government agency may not disregard the outcome of a race-neutral hiring process unless it has a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Id.* at 585. An agency will be liable for disparate-impact discrimination only if a hiring process is not job related and consistent with business necessity, or if there exists an equally valid, less discriminatory alternative that served the needs of the agency but the agency refused to adopt. *Id.* at 547.

47. A government-imposed racially discriminatory preference is constitutional only if the government demonstrates that the preference was necessary to achieve a compelling state interest. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

48. Governments may use racially discriminatory preferences only in remedying "extreme" cases of "systematic[]" patterns of deliberate racial discrimination to "break down

patterns of deliberate exclusion." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 509 (1989).

49.    The Uniform Guidelines on Employee Selection Procedures ("UGESP") have been adopted by the EEOC, Department of Labor, Department of Justice, and Civil Service Commission. 29 C.F.R. § 1607.18, Uniform Guidelines on Employee Selection Procedure (1978); 43 Fed. Reg. 38295, 38312 (August 25, 1978).

50.    The UGESP guidelines draw upon and make reference to professional standards of test validation established by the American Psychological Association. 29 C.F.R. § 1607.5(a).

51.    The UGESP are entitled to deference by the court although the guidelines do not have the force of law. Civil Rights Act of 1964, § 703(h) as amended 42 U.S.C. § 2000e–2(h).  *James v. Stockham Valves & Fittings C*o., 394 F.Supp. 434 (N.D.Ala.1975), *rev'd,* 559 F.2d 310, *cert. denied*, 434 U.S. 1034.

52.    The UGESP are not administrative regulations promulgated pursuant to formal procedures established by Congress. However, "…they do constitute '(t)he administrative interpretation of the Act by the enforcing agency,' and consequently they are 'entitled to great deference.' *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 433-434 (1971)).

53.    The UGESP incorporate a set of principles that are designed to assist employers in complying with requirements of federal law prohibiting employment practices which discriminate on the grounds of race, color, gender, or sex. 29 C.F.R. § 1607.1.

54.    The UGESP is applied by the Federal Government in Title VII cases and applies to tests and selection procedures that are the basis for any employment decision, including hiring. 29 C.F.R. § 1607.2 (A)(D).

55.    The UGESP guidelines allow selection procedures "…for the purpose of determining qualifications or for the purpose of selection on the basis of relative qualifications, if the selection procedure has been validated in accord with [UGESP]

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

9

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

guidelines for each such purpose for which it is used….” 29 C.F.R. § 1607.2.(C).

56.    According to the UGESP, “[t]he use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines, or the provisions of section [§ 1607.6] are satisfied.” 29 C.F.R. § 1607.3(A).

57.    Discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be “predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.” 29 C.F.R. § 1607.4(c).

58.    While the UGESP does not require a user to conduct validity studies of selection procedures where no adverse impact results, all users operating under merit principles are encouraged to use valid selection procedures. 29 C.F.R. § 1607.1(b).

59.    According to the United States Merit Systems Protection Board (“MSPB”)[2]:

Assessment and selection of Federal employees is central to MSPB's mission to promote the management of the civil service in accordance with the merit system principles.[3] The first merit system principle requires that Federal employee “…selection and advancement should be determined solely on the basis of relative ability, knowledge and skills.” When a selecting official considers prior training and experience as part of a hiring or promotion decision, the decision must be made that best identifies true differences in ability as accurately as possible. **No assessment methods should be used which fail to meet professional testing standards for validity**.[4] (Emphasis

[2] U.S. Merit Systems Protection Board, Evaluating Job Applicants: The Role of Training and Experience in Hiring, A Report to the President and Congress of the United States (January 2014), at pg. 3, https://www.mspb.gov/mspbsearch/viewdocs.aspx?docnumber=968357&version=972211&application=ACROBAT.
[3] Title 5 United States Code § 2301 and § 2302. The merit system principles and prohibited personnel practices referenced in this report can be accessed on the web at http://mspb.gov/meritsystemsprinciples.htm and http://mspb.gov/ppp/ppp.htm.
[4] Defined in the U.S. Office of Personnel Management's (“OPM”) Assessment Decision Tool as “The extent to which the assessment method has been shown to accurately measure a job-related competency and/or predict successful performance on the job.”

10

added).

## **GENERAL ALLEGATIONS**

60.     Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

61.     The hiring process used before 2014 required ATC Applicants to pass a validated air traffic aptitude test, known as the Air Traffic Selection and Training Examination ("AT-SAT") in order to be eligible for employment as a trainee controller.

62.     The FAA developed the AT-SAT in approximately 2000-2001 in order to provide a selection tool for new Air Traffic Control Specialist ("ATCS") positions within the FAA.

63.     The AT-SAT was an aptitude test developed to assess the likelihood of an applicant successfully learning ATCS skills as well as a valid predictor of achievement of Certified Professional Controller ("CPC") status. CPC status is achieved after successful completion of air traffic training at an applicant's assigned field facility.

64.     The AT-SAT tested for characteristics needed to effectively perform as an air traffic controller. The characteristics included numeric ability, prioritization, planning, tolerance for high intensity, decisiveness, visualization, problem-solving, and movement detection.

65.     Since the FAA first instituted the AT-SAT, it was validated multiple times to ensure it was in accord with law and professional guidelines. The AT-SAT was most recently validated in March of 2013.

66.     In 2013, the FAA published an employment plan that stated that the FAA was "planning to open a general public announcement in FY 2014 to add more depth and diversity to our controller hiring sources."[5]

67.     On or around December 30, 2013, Joseph Teixeira, then the FAA's Vice

---

[5] Federal Aviation Administration, A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2013-2022 44 (2013).
https://www.faa.gov/air_traffic/publications/controller_staffing/media/CWP_2013.pdf

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

President for Safety and Technical Training, sent an e-mail ("Teixeira E-mail") regarding the future of hiring for air traffic controller positions.

68.    The Teixeira E-mail stated that "[a] nationwide competitive FG-01 vacancy announcement open to all U.S. Citizens will be issued in February 2014. Any individual desiring consideration for employment (including CTI graduates) MUST apply. Existing inventories of past applicants will not be used."

69.    The Teixeira E-mail also stated that "[t]he existing testing process has been updated. The revised testing process is comprised of a biographical questionnaire (completed as part of the application process) and the cognitive portion of the AT-SAT. The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire [BA]. Applicants for the February 2014 announcement will be required to take and pass the new assessments in order to be referred on for a selection decision."[6]

70.    The FAA subsequently held a teleconference with the Air Traffic Collegiate Training Institution ("CTI") schools on January 8, 2014.

71.    During the January 8, 2014 teleconference, Mr. Teixeira falsely stated that "there were no special interest groups involved in the design of the [new] FAA policy at all. This was done by experts in the human resources department and civil rights . . . ."

72.    During the January 8 teleconference, Mr. Teixeira also falsely stated, "[w]e really have not announced these changes to anyone other than to CTI schools, and you received that for the first time on the 30th of December. There's been no announcement . . . ."

73.    Despite the FAA's unequivocal denial, several members of the FAA Human Resources ("HR") and Civil Rights ("CR") Offices had notified, inter alia, the NBCFAE that the FAA was going to change FAA hiring practices to increase the employment of African-

---

[6] The Biographical Assessment was initially referred to as the Biographical "Questionnaire."

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

American applicants.

74.    Specifically, on June 20, 2013, FAA officials met with members of the FAA National Employee Association Forum, which is composed of eight employee associations that represent various minority, women, and disadvantaged sub-groups – including the NBCFAE. The stated purpose of this meeting was to brief the various employee associations on recommended changes in the air traffic controller hiring process.

75.    Among those conducting the June 2013 briefing was FAA consultant Dr. James Outtz. Dr. Outtz presented information about a recently concluded barrier analysis of the FAA air traffic controller hiring process. Dr. Outtz stated that the FAA's hiring process purportedly had a disparate impact on minority candidates, primarily African-American males.

76.    On information and belief, Dr. Outtz's assertions were incorrect, results oriented, and intentionally biased in favor of African-American air traffic applicants.

77.    In February of 2014, FAA spokesman and Public Affairs Officer for the Great Lakes and Central Regions, Tony Molinaro, stated that the decision to change the FAA's hiring process for air traffic controllers was made to "add diversity to the workforce."

78.    On or about March of 2014, then DOT Secretary Foxx stated before Congress that the changes to the hiring process were made "to do a more broad opening of the aperture if you will to get a larger universe of applicants into the program."[7]

79.    The NBCFAE was privy to information that was not publically available as to how ATC Applicants for the February 2014 announcement could increase their chances of advancing in the hiring process.

80.    The NBCFAE e-mailed their members with advice on how to apply for the open air traffic controller positions. This information was provided by Roosevelt Leonard, Jr. – a FAA HR employee who was also a member of the NBCFAE.

81.    NBCFAE National President Roosevelt Lenard, Jr. was in contact with senior

_____

[7] https://www.youtube.com/watch?v=3OrfVpKMQ_c (last accessed September 9, 2018.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

FAA officials, including then Director of FAA Human Resources ("AHR-1") Carrolyn Bostick, regarding Mr. Lenard's desire to change the hiring process to benefit certain ATC applicants based on race.

82.    Ms. Bostick assured Mr. Lenard that the Register would be "purged" and none of these post-assessment applicants would be offered a letter of employment.

83.    Numerous FAA employees and officials, including those formulating or implementing hiring policies at the time in question, were, or are, active members of the NBCFAE.

84.    On May 20, 2015, a major television network revealed that the NBCFAE, specifically FAA employee Shelton Snow, was actively involved in providing 2014 BA questions and answers to select ATC Applicants based on the race of the applicant. This occurred during FAA vacancy announcement 33537 and prior to, or in the course of, the applicants taking the 2014 BA and which gave the select ATC Applicants an unfair advantage.

85.    Mr. Snow is a Supervisory Air Traffic Control Specialist and employee of Defendant FAA.

86.    The television expose revealed that prior to the 2014 BA, Mr. Snow sent email communications to NBCFAE members and recruits that coached them on how to fill out their applications and suggested that certain information and keywords be included in the applications so that the applicants could be identified as a NBCFAE member and/or as being a particular race which would give them preferential treatment.

87.    During this same time period, and prior to FAA vacancy announcement 33537, FAA Human Resources employees appeared after hours at several churches and other venues while wearing government identification. Select applicants, based on race, were invited to attend these functions while others were intentionally excluded. During these events, FAA employees coached, formatted, and actually entered prospective NBCFAE recruits' information and resumes into the USAJOBS.gov and FAA application database.

88.    On information and belief, much of the information entered by the FAA

14

employees for the aforementioned applicants was fabricated and inputted to increase the number of African-American candidates meeting the minimum basic qualifications.

89.    At or about this time, Plaintiff first became aware of the widespread discriminatory actions of the FAA regarding the application and hiring process.

90.    On information and belief, then Deputy FAA Administrator, Molly Harris, stated in an email to senior FAA officials that it was important for them "to find a way to address Congressional inquiries without hurting our case when it comes to litigation."

91.    As a precondition of employment, the FAA has always had basic minimum qualification standards, including having a minimum amount of work experience, U.S. citizenship, and passing medical and security screening requirements.

92.    The United States Office of Personnel Management ("OPM") defines "qualification standards" as the minimum requirements necessary to perform work of a particular occupation successfully and safely. These minimum requirements may include specific job-related work experience, education, medical or physical standards, training, security, and/or licensure. Furthermore, according to the OPM "…qualification standards are not designed to rank candidates, identify the best qualified for a particular position, or substitute for an analysis of an applicant's knowledge, skills, and abilities/competencies…."[8]

93.    Minimum qualifications are defined as the minimum amounts of education or experience and the minimum level of knowledge, skills, abilities, licensures, certifications and other job-related requirements that must be met for a candidate to be considered for a position.

94.    The implementation of the new hiring process and the requirement for applicants to take the BA first occurred in February of 2014. The FAA issued vacancy announcement FAA-AMC-14-ALLSRCE-33537 on February 10, 2014.

95.    ATC Applicants first completed an electronic on-line application and uploaded a resume. They were then required to take and pass the BA.

---

[8] https://www.opm.gov/FAQs/QA.aspx?fid=de14aff4-4f77-4e17-afaa-fa109430fc7b&pid=56f30860-6b28-4899-a8f8-459aa856a077.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

15

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

96.    On information and belief, the BA's grading was elusory and, due to the failure to validate, was not adequate to be used as an employment screening examination.

97.    On information and belief, the BA's grading was designed to disadvantage candidates with aviation experience and provide an advantage to "off the street" applicants.

98.    On information and belief, the BA's grading was not properly designed to identify the individuals most qualified for the air traffic control specialist position.

99.    ATC Applicants did not receive a numerical grade or any indication of whether they passed or failed the BA at the time they took the test.

100.    ATC Applicants failing the BA were provided an electronic "application status" notification that stated, in relevant part, "[b]ased upon your responses to the Biographical assessment, we have determined that you are NOT eligible for the position as a part of the current vacancy announcement." Furthermore, the application status notification stated, "[t]he biographical assessment measures ATCS job applicant characteristics that have been shown empirically to predict success as an air traffic controller in the FAA….This biographical assessment was independently validated by outside experts."

101.    According to the BA's co-creator, John Scott of APTMetrics, the BA was not designed to be used as a minimum qualification assessment or tool. According to Mr. Scott, "[w]e need to be clear that this assessment program [BA] was never designed as a minimum qualification. Assuming that we had the empirical evidence (which we don't) to set a cutoff on these tests that would screen in only the minimally qualified, the result of the application would be to strip this assessment program of its power and utility and essentially render it useless."

102.    Mr. Scott's email was addressed to numerous upper-level FAA managers, including Rickie Cannon, who was the Deputy Director of Human Resources at the time.

103.    Mr. Cannon was a member of the Executive Steering Committee and the chair of the Barrier Analysis Implementation Team, both of which oversaw work on the changes to the hiring process.

16

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

104.    The Executive Steering Committee was, at the time of the changes, chaired by Deputy Administrator Michael Whitaker and served in an advisory and decision-making role.

105.    Furthermore, Mr. Scott stated that "[m]inimum qualifications are best assessed by education, experience, training and potentially through certification or job knowledge tests – not through tests of personal characteristics and aptitude."

106.    However, the FAA ignored Mr. Scott's admonishment and inappropriately used the BA to screen applicants while ignoring education, experience, training, certification, and job knowledge.

107.    On information and belief, the FAA did not review the qualifications or verify that requirements of the vacancy announcement were met until after individuals passed the BA.

108.    On information and belief, the FAA allowed some individuals to provide supplemental information or modify their application, after submission, after they passed the BA, if they did not meet the minimum qualifications or provide enough supporting information.

109.    Dana Broach, Ph.D. is a personnel research psychologist at the FAA Civil Aerospace Medical Institute (CAMI). CAMI is the medical research, education, and occupational health wing of the FAA's Office of Aerospace Medicine. Dr. Broach's primary research area is personnel selection.

110.    Dr. Broach co-authored a CAMI study in October 2013. According to this study, "[Researchers] recommend that if biodata are used to select ATCSs, additional research is needed to identify and validate items predictive of success in training. We also recommend that a criterion measure representative of job performance of air traffic controllers be developed and validated for use in future research on the selection of air traffic controllers."[9]

---

[9] Linda G. Pierce, Dana Broach, Cristina L. Byrne, M. Kathryn Bleckley, *Using Biodata to Select Air Traffic Controllers*, Civil Aerospace Medical Institute, Federal Aviation Administration (October 2013).

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

111.    Dr. Broach, in an internal FAA document dated April 9, 2013, titled Controller Hiring Proposal, states that "[t]here is a trade-off between diversity (adverse impact) and predicted job performance/outcomes."

112.    Dr. Broach's document also asks the question, "[h]ow much of a change in job performance is acceptable to achieve what diversity goals?"

113.    The FAA has repeatedly stated, most recently in March 2018, and affirmed to the public, members of Congress, and the Courts, that the 2014 BA was professionally validated.

114.    The 2014 BA was not validated and the FAA did not have the empirical data necessary for the use of the BA according to industry standards. Federal employee selection is required to be based on the relative ability, knowledge, and skills of the applicant.

115.    On information and belief, the FAA used the non-validated BA in a manner that resulted in disparate treatment and adverse impact upon qualified ATC Applicants and engaged in unlawful racial balancing which was neither job-related nor consistent with business necessity.

116.    Misusing the non-validated 2014 BA and then matching the "results" with resumes entered into the FAA's system by FAA employees to ensure that certain applications would pass basic minimum criteria despite the applicants actual background and status, or matching the "results" with resumes seeded with code-words so as to give an unlawful preference to NBCFAE members or African-American ATC Applicants, violates the constitutional rights of all the ATC Applicants who applied to FAA vacancy announcement 33537.

117.    Following the television Expose, the FAA conducted an investigation into Mr. Snow's actions surrounding the new hiring process.

118.    An investigation was also conducted by the DOT Office of the Inspector General ("OIG"), including investigation as to whether Mr. Snow violated 14 C.F.R. § 65.18 – Written Tests: Cheating or other unauthorized conduct.

**Curry, Pearson & Wooten, PLC**
814 W. Roosevelt Street
Phoenix, Arizona 85007

119.    The DOT OIG Investigation Report revealed that Mr. Snow "organized and facilitated a teleconference for NBCFAE members to 'walk through' the application process, including addressing questions from the BA test, during the open vacancy period."

120.    The DOT OIG Investigation Report also revealed that Mr. Snow "provided a list of 'buzzwords' to NBCFAE members" obtained "as confidential information coming from an NBCFAE member in FAA's [HR] office."

121.    The DOT OIG Investigation Report also revealed that Mr. Snow initially omitted or withheld information regarding his participation in these meetings but after being shown text messages and consulting with counsel, he admitted "responding to these [BA] questions from the group saying he explained to each person how they should answer."

122.    Despite these findings, the FAA and DOT OIG took no adverse or administrative action against Mr. Snow.

123.    The FAA and DOT withheld information regarding Mr. Snow's admissions and lies to federal investigators from the public and Congress.

124.    On information and belief, thousands of qualified ATC Applicants failed the 2014 BA and were improperly eliminated from consideration as to FAA vacancy announcement 33537.

125.    Defendants did not, and cannot, proffer a legitimate, integral, or important reason to justify the implementation and use of the 2014 BA. Even if substantial, legitimate justification was demonstrated, a less discriminatory alternative to the implementation of the BA was available.

**Class Action Allegations**

126.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

127.    This is a class action brought by Plaintiff on his behalf and on behalf of others similarly situated, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and 29 C.F.R. § 1614.204.

128.    The putative Class Plaintiff seeks to represent are ATC Applicants who met the minimum qualifications to be hired by the FAA yet were improperly screened from further consideration by the FAA's improper use of the 2014 BA.

129.    Specifically, the putative Class members were required to take the BA which was intentionally used as a screening tool by FAA personnel to either improperly favor or to disadvantage applicants based upon their race. The use of the BA resulted in disparate impact in violation of federal and state regulation.

130.    As such, the putative Class members were illegally denied a fair and equal opportunity to be considered for employment.

131.    <u>Commonality</u>.  There are common questions of law, practices, and fact as to the members of the Class which predominate over questions affecting only individual members of the Class. Specifically, this case challenges the FAA's improper use the 2014 non-validated BA on FAA vacancy announcement 33537 to target and eliminate from consideration ATC Applicants based upon the applicants' race and not on consideration of proper minimum qualifications. The FAA's use of the BA resulted in members of the Class being eliminated from hiring consideration, even though they met or exceeded the minimum qualifications for the job. There are no unique factual or practice factors that would make class status disadvantageous to any member of the Class. The FAA instituted a single decision to adopt a new hiring practice for air traffic controllers and improperly used the BA which affected all Class members. Defendants' motivation and purported evidence for the decision is common to all Class members.

132.    <u>Typicality</u>.  Plaintiff's claims for the remedies stated herein are typical of the claims of all members of the putative Class because all members of the putative Class were improperly denied employment although they met the minimum qualifications to be further considered for employment. The Class members sustained similar injuries and damages arising out of Defendants' common course of unlawful conduct. The injuries and damages of all members of the Class were caused by Defendants' improper use of the 2014 BA.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

133.  <u>Numerosity</u>. The potential quantity of members of the putative Class as defined is so numerous that joinder of all members would be unfeasible and impractical. Approximately 28,511 ATC Applicants took the 2014 BA. Of those, 26,104 "failed" the BA and were eliminated from further employment consideration. A large number of those eliminated met the FAA's actual stated minimum qualifications and, but for the BA, should have been given the opportunity to be further considered for employment. They "failed" because the FAA used the BA as a tool to improperly screen for minimum qualifications as well as to identify, target, and eliminate candidates based on race. The disposition of their claims through this class action will benefit both the parties and this Court. While the exact quantity of members of the Class is unknown at this time, it is estimated that the Class number is in excess of 20,000 individuals. The quantity and identity of such membership, or those meeting the FAA's stated minimum qualifications, is easily ascertainable through inspection of Defendants' records. Specifically, and according to FAA vacancy announcement 33537, ATC Applicants minimum "basic" qualifications, excluding the BA, were: U.S Citizenship; 30 years or less in age; 3 years of progressively responsible work experience at 40 hours per week; or, 4 years of college study leading or a bachelor's degree; or, a combination of work experience and college totaling 3 years. It is assumed a large number of the putative class members will meet these basic qualifications.

134.  <u>Adequacy</u>.  Plaintiff is an adequate representative of the putative Class and, as Class Representative, will fairly protect the interests of the members of the Class. Plaintiff has no interests antagonistic to the members of the Class and will vigorously pursue this suit via Counsel. Plaintiff's Counsel, Proposed Class Counsel, are competent and experienced in litigating large cases, are preeminent in their fields, and members of the firms have experience in litigating complex matters including employment and constitutional law cases. Approximately 450 potential Class members have contacted Plaintiff's Counsel prior to the filing of this Complaint.

135.  <u>Ascertainable Class</u>. The proposed Class and each subclass are ascertainable in

that their members can be identified and located using information contained in Defendants' records. The FAA's Human Resources Office, as well as other FAA offices, maintains a list of job applicants, their qualifications, and their exam scores based on announcement number.

136.     <u>Superiority</u>.  The nature of this action and the questions of law or fact common to Class members predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy for the following reasons, without limitation:

a.     This case involves federal agencies and officials and a sufficient group of individual Class members with many claims and common issues of law and fact;

b.     if each individual member of the Class were required to file an individual lawsuit, Defendants would necessarily gain an unjust advantage because Defendants would be able to exploit and overwhelm the limited resources of each individual member of the Class with Defendants' vastly superior financial and legal resources;

c.     requiring each individual member of the Class to pursue an individual lawsuit would discourage the assertion of lawful claims by the members of the Class who would be disinclined to pursue an action against Defendants because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers, and well-being;

d.     proof of a common practice or factual pattern, of which the members of the Class experienced, is representative of the Class herein and will establish the right of each of the members of the Class to recover on the causes of action alleged herein;

e.     the prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts adjudications with respect to the individual members of the Class against Defendants and which would establish potentially incompatible standards of conduct for Defendants;

f.     many members of the Class were not aware of the FAA's actions at the time they took the BA. Plaintiff exhausted administrative remedies and is properly before the Court. As federal job applicants have a very short time period to pursue administrative remedies and

22

file suit, individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs, while an important public interest will be served by addressing the matter as a class action; and

g.    the cost to the judicial system of such individualized litigation would be substantial and a waste of valuable adjudicative and judicial resources.

137.    <u>Manageability of Class and Common Proof</u>.  The nature of this action makes this class action a particularly efficient and appropriate procedure to afford relief to Plaintiff for the FAA's alleged unlawful actions. Specifically, the primary issue turns upon the FAA's single decision force minimally qualified ATC Applicants to take a non-validated test that was unlawfully used as a screening mechanism. Assuming that equitable tolling is available due to the effected ATC Applicants' lack of awareness of the FAA's unlawful hiring activities, individual adjudication would prejudice Defendants opposing the Class by requiring the United States government to allocate scarce judicial resources to individually adjudicate the claims of an estimated 20,000 to 25,000 disenfranchised applicants.

**<u>Claims of Named Plaintiff</u>**

138.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

139.    Plaintiff has significant academic qualifications and aviation experience.

140.    Plaintiff greatly exceeds the FAA's minimum basic qualifications required of ATC Applicants.

141.    Specifically, Plaintiff has been awarded two college degrees in aviation related subject matter by Arizona State University. The degrees are a Bachelor of Science ("BS") degree in Aeronautical Management and a BS Degree in Air Traffic Management. Plaintiff received both degrees in 2013 – prior to applying for FAA vacancy announcement 33537.

142.    Plaintiff also has aviation job experience, working for a major U.S. airline as a safety specialist before applying to FAA vacancy announcement 33537.

143.    Plaintiff was less than 30 years old and a U.S. citizen when he applied to FAA

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

vacancy announcement 33537.

144.    Plaintiff applied for FAA vacancy announcement 33537 and took the February 2014 BA in good faith based on representations and the belief that the BA was fairly constructed, validated, related to the job qualifications necessary to become an air traffic controller, and that he would be given a fair and equal opportunity.

145.    Despite aviation academic and work experience that greatly exceeded the minimum qualifications for employment as an air traffic control specialist, Plaintiff was notified approximately one month after taking the BA that he did not "pass" the BA. He did not receive a numerical score on the BA.

146.    Plaintiff was not hired in vacancy announcement 33537 and, therefore, suffered an adverse employment action (non-selection).

147.    At the time Plaintiff took the BA, he was not aware that the BA was not validated.

148.    Plaintiff was not aware that certain FAA employees and agents were using the BA to screen candidates and actually penalize those with aviation education or work experience.

149.    On information and belief, a certain element within FAA Human Resources, infected with NBCFAE bias, believed that those with aviation education or experience were largely non-African-American ATC Applicants.

150.    The FAA improperly used the BA as a race or national origin screening tool and eliminated outstanding candidates that exceeded the actual minimum requirements for employment consideration as an air traffic controller.

151.    Plaintiff became aware that the BA test had been compromised by the NBCFAE and that the BA was improperly used to screen and unfairly to target him, and others similarly situated, in August 2015.

152.    Plaintiff filed a timely administrative complaint and exhausted administrative remedies as enumerated above.

24

Curry, Pearson & Wooten, PLC

814 W. Roosevelt Street

Phoenix, Arizona 85007

153.    Due to the FAA's actions, Plaintiff suffered damages as enumerated further herein.

### First Cause of Action

### Disparate Impact Discrimination (Title VII- 42 U.S.C. § 2000e-16 of 1964, et. seq.)

(On behalf of Plaintiff and the Class)

154.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

155.    This claim is brought on behalf of Plaintiff and the Class he seeks to represent. Plaintiff has filed a timely charge with the EEOC and thus exhausted his administrative remedies.

156.    On information and belief, the FAA's reliance on illegitimate and non-validated systems and criteria in the evaluation and hiring of prospective air traffic controllers regarding vacancy announcement FAA-AMC-14-ALLSRCE-33537 ("33537") had an adverse impact on non-African-American ATC Applicants in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

157.    Among the illegitimate systems and criteria relied on by the FAA in the selection and employment of air traffic control applicants was the implementation and use of the BA.

158.    The BA was designed and constructed to give unfair employment consideration and advantage to African American applicants and to disadvantage non-African American and mixed race applicants.

159.    The use of the BA and other discriminatory acts that constitute the FAA's pattern and/or practice of discrimination have occurred both within and outside the liability period enumerated herein.

160.    As a direct result of the FAA's discriminatory policies and/or practices as

described above, Plaintiff and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

161.    The foregoing conduct illustrated throughout this Complaint constitutes illegal intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. § 2000e, et. seq.

162.    Plaintiff requests relief as hereinafter described.

**WHEREFORE**, Plaintiff prays:

A.    for certification of the case as a class action on behalf of the proposed Class;

B.    for designation of Plaintiff as the representative of the Class;

C.    for designation of Plaintiff's Counsel as Class Counsel;

D.    that this Court declare that the FAA's racially motivated implementation and use of the 2014 BA violated Title VII of the Civil Rights Act of 1964;

E.    that this Court enter an order enjoining the FAA, its employees, agents, and representatives, and any and all persons acting in concert with them, from engaging in policies and patterns and/or practices that discriminate against Plaintiff or the Class because of their race, national origin, or participation in this lawsuit;

F.    that this Court enter an order that the FAA is to institute and carry out polices, practices, and programs that provide equal employment opportunities regardless of race or national origin and that it eradicate the effects of their past and present unlawful employment actions;

G.    that this Court enter an order requiring the FAA to develop and institute accurate and validated standards for hiring air traffic controllers;

H.    that this Court enter an order appointing a monitor to ensure that the FAA complies with the injunction provisions of any decree that the Court orders;

I.    that this Court enter an order retaining jurisdiction over this action to ensure that the FAA complies with any such decree;

J.    that this Court award damages including, but not limited to, back pay, front pay,

26

hiring, and reinstatement of the opportunity to be hired;

K.    that this Court award costs and attorney's fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k);

L.    that this Court award pre-judgment and post-judgment interest, as provided by law; and

M.    that this Court award such further relief as this Court deems just and equitable.

**RESPECTFULLY SUBMITTED** this 25th day of November, 2019.

                            **CURRY, PEARSON & WOOTEN, PLC**

                            */s/ Michael W. Pearson*
                            Michael W. Pearson, DDC Bar No. 997169
                            814 W. Roosevelt St.
                            Phoenix, AZ 85007
                            Office: (602) 258-1000
                            Facsimile: (602) 523-9000
                            docket@azlaw.com
                            mpearson@azlaw.com
                            *Attorneys for Plaintiff Lucas Johnson*
                            *and Putative Class*